Nathan D. Quist
Utah Bar No. 16143
VALIENTE MOTT
2975 W. Executive Parkway
Lehi, Utah 84043
Telephone: 385-999-2999
Email: nate@valientemott.com
*Attorneys for Plaintiffs*

| THE UNITED STATES DISTRICT COURT |  |
|---|---|
| **DISTRICT OF UTAH** | |
| **ELIZABETH BARRETT and DANIEL BARRETT,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**JOHNSON & JOHNSON and ETHICON, INC.,**<br><br>**Defendants.** | **PLAINTIFF'S COMPLAINT AND JURY DEMAND**<br><br>**Case No.** _1:22-cv-00154-CMR<br><br>**JURY DEMANDED** |

Plaintiffs Elizabeth Barrett ("Plaintiff" or "Ms. Barrett") and Daniel Barrett ("Mr. Barrett") (collectively "Plaintiffs") file their Complaint and Jury Demand against Johnson & Johnson ("J&J") and Ethicon, Inc. ("Ethicon") (collectively "Defendants") alleging the following:

## NATURE OF ACTION

1.      This action seeks to recover damages for injuries sustained by Plaintiffs as the direct and proximate result of the wrongful conduct of Defendants in connection with the designing, manufacturing, developing, distributing, labeling, advertising, marketing, promoting, and selling a mesh product known as Gynecare Gynemesh PS ("Gynemesh PS").

**PARTIES**

2.    Plaintiffs suffered damages as a result of Defendants' intentional and negligent conduct, and they are and were, at all material times, citizens, and residents of Utah.

3.    Defendant J&J is a New Jersey corporation and a multinational marketer, promoter, seller, producer, manufacturer, and developer of medical devices such as Gynemesh PS. Defendant J&J is incorporated in New Jersey alone and maintains its principal place of business at 501 George Street, New Brunswick, New Jersey.

4.    Defendant Ethicon is a corporation incorporated in New Jersey alone and a wholly owned subsidiary of Defendant J&J. Defendant Ethicon researched, designed, developed, promoted, marketed, tested, and distributed Gynemesh PS. Defendant Ethicon maintains its principal place of business at 1000 Route 202, Raritan, New Jersey.

**JURISDICTION AND VENUE**

5.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) as there is complete diversity among Plaintiffs and Defendants and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

6.    Defendants have significant contacts with this federal judicial district and therefore they are subject to the personal jurisdiction of the Court in this district.

7.    Specifically, Defendants placed medical devices into the stream of commerce by designing, manufacturing, advertising, promoting, and selling the defective Gynemesh PS product, including the product implanted in Plaintiff in this district.

8.    At all relevant times, Defendants labeled and packaged the Gynemesh PS product, including the product which was implanted in Plaintiff in this district.

9.     Defendants have transacted business within the state of Utah.

10.     Defendants have purposefully and systematically committed acts and consummated transactions in the state of Utah from which they have derived and continue to derive substantial revenue, and they have otherwise committed purposeful actions in the state of Utah.

11.     A substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this federal district and therefore, pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in this district.

12.     Specifically, Plaintiff's initial surgery during which she was implanted with Defendants' defective Gynemesh PS product occurred in the District of Utah.

13.     Plaintiffs resided in the District of Utah at the time Ms. Barrett began to experience symptoms associated with the defective mesh product developed, manufactured, and sold by Defendants, and when she underwent her excision procedure.

14.     The products at issue in this lawsuit failed due to defects in design in the District of Utah.

## FACTS

**A.  Plaintiff Elizabeth Barrett was injured by Defendants' defective and unreasonably dangerous mesh products.**

15.     Ms. Barrett was implanted with Defendants' Gynemesh PS product by Dr. Jeffrey Arrington at Ogden Regional Medical Center in Ogden, Utah on December 29, 2011.

16.     The implanted Gynemesh PS was intended to treat Ms. Barrett's enterocele.

17.     The Gynemesh PS product was utilized and implanted in a manner foreseeable to Defendants using Defendants' instructions for use and procedures for implantation.

18.     Following the implant surgery, Ms. Barrett's condition appeared to improve.

- 3 -

19.     On December 18, 2020, Ms. Barrett underwent a cystoscopy, which revealed a large bladder stone and caused Ms. Barrett's provider to suspect an underlying erosion of the implanted Gynemesh PS.

20.     In her notes on the cystoscopy, Dr. Laura Foot wrote: "I'm suspecting eroded mesh."

21.     On January 7, 2021, Ms. Barrett underwent a mesh revision and removal of the bladder stone performed by Dr. Laura Foot.

22.     Dr. Foot noted that the mesh had eroded into the bladder wall.

23.     On June 9, 2021, a recurrent erosion and bladder stone were discovered. This erosion presented a high risk to Ms. Barrett because of its proximity to her ureters and sphincters.

24.     Ms. Barrett underwent a second mesh revision surgery on November 30, 2021 performed by Dr. Sara Lenherr.

25.     Dr. Lenherr determined this erosion presented a high risk to Ms. Barrett because of its proximity to her ureters and sphincters.

26.     During surgery, a large portion of mesh and tissue had to be excised from Ms. Barrett's body.

27.     Pathology confirmed Ms. Barrett's tissue was chronically inflamed.

28.     After having nearly all of the mesh removed from her body, Ms. Barrett began to feel generally improved.

29.     Ms. Barrett continues to experience occasional pain, urgency, frequency, and intermittent bleeding.

30.     The mesh implanted in Ms. Barrett's body caused a severe chronic foreign body reaction, which was ongoing, latent, and did not manifest as a discoverable injury until late December 2020.

31.     The occurrence of a severe chronic foreign body reaction is documented in the pathology reports and surgical reports from 2021.

32.     As a result of having the Gynemesh PS product implanted in her, Ms. Barrett has experienced significant mental and physical pain, disability, suffering, permanent injuries, substantial physical deformity, and has suffered financial loss, including, but not limited to, obligations for medical services and expenses.

**B.  The unreasonably dangerous nature of Defendants' Gynemesh PS.**

33.     In 2002, Defendants launched Gynemesh PS.

34.     Scientific evidence pre-dating and post-dating the product launch shows that the polypropylene mesh used in mesh products, like Gynemesh PS, is biologically incompatible with human tissue.

35.     The polypropylene mesh used in Gynemesh PS promotes an immune response in many women, which can degrade the mesh and pelvic tissue.

36.     The serious immune response to the polypropylene mesh used in Gynemesh PS also causes chronic pelvic tissue inflammation, shrinkage, or contraction of the mesh leading to nerve entrapment, further inflammation, chronic infections, and chronic pain.

37.     Due to the unreasonably dangerous nature of Gynemesh PS, women like Plaintiff can experience significant urinary dysfunction, vaginal shortening, and anatomic deformation as well.

38.    The specific defects posed by Gynemesh PS include, but are not limited to, the following:

a.    The use of polypropylene material in the product and the immune reactions that result from such material causing adverse reactions and injuries;

b.    No procedure had been designed for safe, effective removal of the product;

c.    Biomechanical issues with the design of the product, including, but not limited to, the propensity of the product to contract or shrink once implanted causing surrounding tissue to be inflamed, fibrotic, and contracted;

d.    The rigid nature of the product causes it to become improperly mated to the delicate and sensitive areas of the vagina and pelvic causing pain during normal daily activities involve movement of the pelvic area;

e.    The mesh utilized in Gynemesh PS is too heavy for its purpose;

f.    The pores of the mesh utilized in Gynemesh PS are too small for its purpose;

g.    The propensity of the product to degrade or fragment over time, which can cause a chronic inflammatory and fibrotic reaction resulting in injury; and,

h.    The adverse tissue reactions caused by the product is causally connected to more frequent infection.

39.    At all material times Defendants knew their Gynemesh PS product was unreasonably dangerous.

40.    As a result of being implanted with Defendants' unreasonably dangerous mesh product, Plaintiff experienced a chronic foreign body response, inflammation, mesh erosion, pelvic pain, and bleeding.

C. **Defendants knew or should have known their Gynemesh PS was defective and unreasonably dangerous and failed to warn.**

41.     Defendants failed to conduct adequate testing to ensure Gynemesh PS was reasonably safe for implantation in the female pelvic area before attempting to introduce this product into the market.

42.     At all relevant times, Defendants knew or should have known of the significant risks and high complication rate posed by implanting Gynemesh PS into the female body.

43.     Defendants willfully suppressed relevant information about the serious risks posed by products utilizing Gynemesh PS mesh. For instance:

    a.   Defendants concealed information about the risk of dyspareunia;

    b.   Defendants declined internal requests to improve their information for use ("IFU") disclosures;

    c.   Defendants avoided learning negative information about its mesh products;

    d.   When notified by the FDA in 2008 of the significant risks posed by mesh like the Gynemesh PS, Defendants did not proactively engage with implanting providers or consumers;

    e.   Defendants did not warn that complete removal of the product may not be possible and may not result in complete resolution of complications;

    f.   Defendants did not warn of the potential need for mesh removal until 2015, long after Plaintiff's implant;

    g.   Defendants did not warn of the need for multiple revisions or significant dissection during revision surgery until 2015, long after Plaintiff's implant; and,

      h.   Defendants did not, and have never, warned of the potential for post-operative side effects that could impact quality of life and daily routine.

44.    Defendants nevertheless marketed Gynemesh PS directly to its potential patient population through patient brochures, in-office patient counseling materials, internet advertising, public relations events, etc. The goal of this marketing was to create consumer demand.

45.    Defendants likewise aggressively marketed to doctors.

46.    At all relevant times, Defendants downplayed the risks posed by their mesh products and warnings about the products from the FDA. This is particularly notable in Defendants' representations regarding the rate, manner, and severity of erosion/extrusions and the permanency of issues stemming from these products.

47.    Defendants cultivated the impression that its mesh products, like Gynemesh PS, were safer and more effective than non-mesh approaches to treating stress urinary incontinence.

48.    Defendants provided incomplete, insufficient, and misleading training and information to physicians to increase the number of physicians utilizing their pelvic mesh products.

49.    As a result of Defendants providing incomplete and misleading information about Gynemesh PS to physicians, such providers disseminated inadequate and misleading information to their patients.

50.    Defendants failed to provide sufficient warnings and instructions that would have put Plaintiff, her providers, and the general public on notice of the dangers and adverse effects caused by the implantation of Gynemesh PS.

51.    Defendants knew Gynemesh PS was defective and unreasonably dangerous but continued to manufacture, market, distribute, and sell these products to maximize sales and profits at the expense of health and safety.

52.    Defendants' acts were willful, reckless, and wanton, and the proximate cause of Plaintiff's injuries.

**D.  Defendants profited from their defective product.**

53.    When Plaintiff underwent the surgical implant of Defendants' Gynemesh PS product, Defendants enjoyed financial gain by accepting payment for the devices by Plaintiff or by others on her behalf.

54.    Plaintiff did not receive safe or effective products for which Defendants were compensated by Plaintiff or by others on her behalf.

55.    The product, as set forth above, caused Plaintiff severe medical problems.

56.    Despite this inequity, Defendants retained the money paid for the defective products by Plaintiff or by others on her behalf.

**E.  Overview of Defendants' actions and omissions in marketing and warning of the defects intrinsic in their mesh product evince fraud.[1]**

57.    When medical device manufacturers like Defendants advertise their products, they must do so truthfully regardless of whether the manufacturers target doctors or patients.

58.    Defendants here, however, failed to be truthful with doctors and patients, like Plaintiff, about the risks presented by the material used in their mesh product Gynemesh PS.

---

[1]    The accounting of Defendants' acts and omissions in concealing and misrepresenting risks of its mesh to the public and to doctors is only a sampling of the evidence supporting Plaintiff's claims to ensure compliance with Rule 9(b) and to set forth facts demonstrating that Defendants acted in a willful, reckless, and wanton manner.

59.     Defendant Ethicon's medical director, Dr. Piet Hinoul, has testified that these Defendants knew by at least 1998 that the mesh used in Gynemesh PS cause severe, long-term complications such as contraction or shrinkage of the tissue surrounding the mesh implant, chronic pain, and a range of urinary dysfunction complications.

60.     Prior to Ms. Barrett's implant, Defendants also knew that complications from their Gynemesh PS product could be sufficiently severe to necessitate removal, and that the removal of implanted mesh could be difficult, harmful, and require multiple surgeries.

61.     Defendants concealed their knowledge of these serious risks of the mesh product from the patients and doctors they targeted through their representations in advertising and by circulating incomplete Instructions for Use warnings.

62.     Defendants' marketing and Instructions for Use misrepresented, downplayed, and concealed the potential for serious, lifelong complications and instead held the product out as a safe, speedy, and effective solution to stress urinary incontinence.

63.     Defendants also parroted these misrepresentations and concealed risks through their messaging to doctors through sales representatives, in-person trainings, and promotional seminars.

64.     Defendants paid consultants to deliver marketing messages through company-approved training and presentations.

65.     Collectively, Defendants aimed to assuage risks and drive the use of mesh implants.

66.     Defendants' own representatives have admitted that Defendants chose to conceal the fact that the mesh implanted in Plaintiff could cause complications so severe as to necessitate removal and chose not to share that information because it would be bad for business.

67.    Defendant Ethicon's former marketing director, Laura Angelini, for instance, wrote "if we, in any way, publish [information about the potential need for removal], we start giving reason to believe that explant of [the mesh] may be needed in some circumstances." Defendants did not include the risk of or potential need for the removal of mesh in its Instructions for Use until 2015.

68.    In 2008, the FDA issued a warning that the type of mesh utilized in the product implanted in Plaintiff could present "serious consequences" and advised that patients should be informed about risks, including the effect on quality of life, scarring, and other severe risks. Defendant Ethicon's president, Renee Selman, did not heed the warning and instructed sales representatives that "they are not to proactively initiate conversations with customers about this notice." She further instructed sales staff to tell doctors who inquired about the FDA warning that the risks were included in the labeling for Defendants' products. This was untrue as the risks mentioned were not included in Defendants' instructions for use until 2015.

69.    In 2008 and 2009, Defendants disregarded an internal medical professional, Meng Chen's, request to improve the instructions for use for Defendants' stress urinary incontinence mesh. Again, Defendants failed to update their instructions for use until 2015.

70.    Dr. Weisberg, a medical director for Defendants, testified that the warnings included in the 2015 instructions for use were adverse events Defendants knew to be reasonably associated with devices, including the product implanted in Plaintiff, by 1998 and that including such information in the instructions for use was reasonable and feasible long before 2015.

71.     Defendants chose not to include complete information in their Instructions for Use or marketing materials, misled providers and patients, and profited from their decisions while women, like Plaintiff, were permanently injured.

## CAUSES OF ACTION

### COUNT I
### Product Liability Act - Strict Liability

71.     Plaintiff incorporates by reference each and every material fact of this Complaint as if set forth fully herein.

72.     Defendants' Gynemesh PS product was defective and unreasonably dangerous for their intended and reasonably foreseeable use in numerous ways, including Defendants' design, manufacture, and use of materials too heavy for safe assimilation/absorption into human tissue; materials too porous for safe assimilation/absorption into human tissue; and no design mechanism to permit safe removal.

73.     Defendants' Gynemesh PS product was designed and manufactured in a manner that did not meet or perform to the expectations of patients and their healthcare providers, including Plaintiff and her healthcare providers.

74.     Defendants' Gynemesh PS product was dangerous to an extent beyond that which would be contemplated by the ordinary consumer, considering the product's characteristics, propensities, risks, dangers, and uses.

75.     These defects existed at the time Gynemesh PS product, and specifically the product implanted into Plaintiff, left the possession and control of Defendants, and were sold and eventually implanted into Plaintiff.

76.    Alternative, safer designs of the product were practicable, available, and feasible at the time Gynemesh PS was sold.

77.    The defective nature of the Gynemesh PS caused Plaintiff's injuries.

78.    Defendants are liable to Plaintiff in strict liability.

79.    Plaintiff will continue to suffer the above-referenced and new injuries until her death.

80.    As a direct and proximate results of Defendants' wrongful conduct, including Defendants' design manufacture, labeling, marketing, sale and distribution of Pelvic Mesh Products, Plaintiff has sustained and will continue to sustain, severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering, and has incurred economic loss.

## COUNT II
### Product Liability Act - Failure to Warn

81.    Plaintiff incorporates by reference each and every material fact of this Complaint as if set forth fully herein.

82.    The Gynemesh PS product implanted in Plaintiff was not reasonably safe for its intended use and was defective as described herein as a matter of law due to its lack of appropriate and necessary warnings.

83.    Defendants were aware that Gynemesh PS, as described herein, degrades, contracts, shrinks, frays, cords, migrates, stiffens, and/or otherwise deforms at all times relevant to Plaintiff's claims.

84.    Defendants owed a duty to Plaintiff at all material times to warn of their product's known characteristics or defective propensities as described herein.

85.     Defendants breached and continue to breach the duties owed to Plaintiff, her medical providers, the medical community, and/or the public by providing incomplete, insufficient, and misleading training and information to physicians and the medical community.

86.     Defendants' failure to provide sufficient, correct, or complete information led to the dissemination of inadequate and misleading information to patients, including Plaintiff.

87.     Defendants did not disclose and hid the magnitude and frequency of problems associated with Gynemesh PS from implanting physicians.

88.     Like Plaintiff, implanting physicians relied on the limited information provided by Defendants in selecting their products for treatment and would have made different treatment recommendations had they known the true magnitude and frequency of the risks associated with Gynemesh PS.

89.     Defendants provided inadequate warnings to Plaintiff's physician, who relied on them in deciding to implant Plaintiff with Gynemesh PS.

90.     Defendants' failure to warn caused Plaintiff's injuries.

91.     Defendants are liable to Plaintiff for failure to warn.

92.     Plaintiff will continue to suffer the above-referenced and new injuries until her death.

93.     As a direct and proximate result of Defendants' wrongful conduct, including the dissemination of defective warnings, both at the time of marketing and after the sale of the product, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering, and has incurred economic loss.

## COUNT III
## Negligence

94.     Plaintiff incorporates by reference each and every material fact of this Complaint as if set forth fully herein.

95.     Defendants owed a duty to Plaintiff and the consuming public to exercise reasonable and ordinary care in the design, labeling, instructions, warnings, sale, marketing, and distribution of Gynemesh PS, as well as the recruitment and training of physicians to implant these products in women.

96.     Defendants had a further duty to provide adequate and sufficient instructions concerning the proper use of the Gynemesh PS, as well as warnings regarding the risks and dangers associated with using these products to Plaintiff and other foreseeable users of these products.

97.     Defendants, however, breached their duty of care and were negligent in the design, labeling, warning, instruction, training, selling, marketing, and distribution of Gynemesh PS in one or more of the following ways:

    a.   Failing to design the Gynemesh PS so as to avoid an unreasonable risk of harm to women in whom the products were implanted, including Plaintiff;

    b.   Failing to use reasonable care in the testing of Gynemesh PS, so as to avoid an unreasonable risk of harm to women in whom the products were implanted, including Plaintiff;

    c.   Failing to use reasonable care in inspecting the Gynemesh PS, so as to avoid an unreasonable risk of harm to women in whom the products were implanted, including Plaintiff;

- 15 -

d.  Failing to use reasonable care in training its employees and healthcare providers related to the use of the products, so as to avoid an unreasonable risk of harm to women in whom the Gynemesh PS was implanted, including Plaintiff;

e.  Failing to use reasonable care in instructing and/or warning the public, healthcare providers, and patients, including Plaintiff, as set forth herein of risks associated with Gynemesh PS, so as to avoid an unreasonable risk of harm to women in whom these products were implanted, including Plaintiff;

f.  Failing to use reasonable care in marketing and promoting the Gynemesh PS, so as to avoid an unreasonable risk of harm to women in whom these products were implanted, including Plaintiff;

g.  In negligently and carelessly promoting the use of the Gynemesh PS to physicians who had not received sufficient training to master the techniques necessary for the implantation of the device into women, including Plaintiff;

h.  Failing to develop a safe, effective removal process in the event of failure, injury, or complication;

i.  Choosing to use polypropylene material in its Gynemesh PS which was known to incite a chronic inflammatory response in women;

j.  Selling Gynemesh PS when it knew or should have known that the warnings included were incomplete and insufficient;

k.  Undermining the lack of safety and efficacy of its products in the media; and,

l.  Otherwise negligently or carelessly designing, marketing, distributing, warning, labeling, studying, testing, or selling the Gynemesh PS.

98.     As a direct and proximate result of Defendants' negligence, Plaintiff was implanted with Gynemesh PS and suffered serious bodily harm.

99.     As a direct and proximate result of Defendants' wrongful conduct, including the negligence described herein, both at the time of marketing and after the sale of the product, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering, and has incurred economic loss.

## COUNT IV
## Breach of Implied Warranty

100.     Plaintiff incorporates by reference each and every material fact of this Complaint as if set forth fully herein.

101.     At all relevant and material times, Defendants manufactured, distributed, advertised, promoted, and sold Gynemesh PS products.

102.     At all relevant times, Defendants intended that Gynemesh PS products be implanted for the purposes and in the manner that Plaintiff or Plaintiff's implanting physicians in fact used them, and Defendants impliedly warranted each product to be of merchantable quality, safe and fit for such use, and was not adequately tested.

103.     Defendants were aware that consumers, including Plaintiff or Plaintiff's physicians, would implant Gynemesh PS products in the manner directed by the Instructions for Use, which is to say that Plaintiff was a foreseeable user of Gynemesh PS products.

104.     Plaintiff and/or her physicians were at all relevant times in privity with Defendants.

105.     The products were expected to reach and did in fact reach consumers, including Plaintiff or Plaintiff's physicians, without substantial change in the condition in which Defendants manufactured and sold their products.

106.    Defendants breached various implied warranties with respect to the Gynemesh PS products, including the following particulars:

a.    Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the product was safe and fraudulently withheld and concealed information about the substantial risks of serious injury and/or death associated with using the product;

b.    Defendants represented that the product was safe, and/or safer than other alternative devices or procedures and fraudulently concealed information which demonstrated that the product was not as safe or safer than alternatives available on the market; and,

c.    Defendants represented that the products were more efficacious than other alternative medications and fraudulently concealed information regarding the true efficacy.

107.    In reliance upon Defendants' implied warranty, Plaintiff and/or her physicians used the product as prescribed and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

108.    Defendants breached their implied warranty to Plaintiff in that the product was not of merchantable quality, safe and fit for its intended use, or adequately tested, in violation of Common Law principles.

109.    As a direct and proximate result of Defendants' wrongful conduct, including Defendants' breach of implied warranty, Plaintiff has sustained and will continue to sustain severe

and debilitating injuries, serious bodily injury, mental and physical pain and suffering, and has incurred economic loss.

## COUNT V
## Fraudulent Concealment

110.    Plaintiff incorporates by reference each and every material fact of this Complaint as if set forth fully herein.

111.    At all relevant times, Defendants misrepresented the safety of Gynemesh PS for its intended use.

112.    It was known or should have been known to Defendants that Gynemesh PS caused large numbers of serious complications and that the efficacy rate of the product meant that it was not safe or effective.

113.    Despite Defendants' knowledge of problems and defects with their product, Defendants continued to represent Gynemesh PS as being safe.

114.    Defendants knew or were reckless in not knowing that their representations were false.

115.    Defendants were under a duty to disclose to Plaintiff, her physicians, hospital, healthcare providers, and/or the FDA the defective nature of Gynemesh PS.

116.    Defendants had sole access to the material facts concerning the defective nature of the product and its propensity to cause serious, dangerous side effects resulting in damage to Plaintiff, who was implanted with Gynemesh PS.

117.    Defendants were in a superior position to know the true safety and efficacy of Gynemesh PS.

118.    Defendants continued to make knowingly false statements in documents and marketing materials regarding the safety and efficacy of its products.

119.    Defendants fraudulently and affirmatively concealed the defective nature of Gynemesh PS from Plaintiff.

120.    At all material times, Defendants willfully, intentionally, and maliciously concealed facts from Plaintiff and her physician with the intent to defraud them.

121.    Defendants knew Plaintiff and her physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions.

122.    Plaintiffs and her doctors, healthcare providers, and/or hospitals reasonably relied on Defendants' false information and marketing materials.

123.    The facts concealed and/or not disclosed by Defendants to Plaintiff were material facts that a reasonable person would have considered to be important in deciding whether or not to purchase and/or use the Gynemesh PS.

124.    Plaintiff acted diligently in consulting with her medical providers regularly.

125.    Due to Defendants' fraudulent concealment, Plaintiff did not discover, nor should she have discovered, facts sufficient to put her on notice of a potential cause of action stemming from a defective mesh product until 2021.

126.    As a result of the foregoing acts and omissions, Plaintiff suffered severe physical pain and mental anguish.

127.    As a direct and proximate result of Defendants' wrongful conduct, including Defendants' fraudulent concealment, Plaintiff has sustained and will continue to sustain severe

and debilitating injuries, serious bodily injury, mental and physical pain and suffering and has

incurred economic loss.

## COUNT VI
## Negligent Misrepresentation

128.    Plaintiff incorporates by reference each and every material fact of this Complaint

as if set forth fully herein.

129.    Defendants incurred a duty to accurately represent to the medical and healthcare

community, Plaintiff, and the public that the Gynemesh PS had not been adequately tested and

found to be safe and efficacious.

130.    Defendants breached this duty by misrepresenting and actively concealing adverse

information within its actual or constructive knowledge regarding the Gynemesh PS defects and

unreasonably dangerous qualities.

131.    Defendants negligently and/or intentionally misrepresented or omitted necessary

and required information in the product labeling, promotions, and advertisements.

132.    These misrepresentations were untrue and misleading.

133.    Defendants knew or should have known of the falsity or misleading nature of their

misrepresentations.

134.    Defendants nevertheless made these misrepresentations about the Gynemesh PS'

safety and efficacy with the intent that Plaintiff and/or her providers would rely on them, leading

to the implantation of these products in her body.

135.    Plaintiff and/or her physicians relied on these misrepresentations.

136.    At the time of Defendants' misrepresentations, neither Plaintiff nor her providers

knew of the falsity of Defendants' misrepresentations.

137.    As a result of Defendants' misrepresentations, Plaintiff suffered severe physical pain and mental anguish.

138.    As a direct and proximate result of Defendants' wrongful conduct, including Defendants' misrepresentations, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering and has incurred economic loss.

## COUNT VII
## Punitive Damages

139.    Plaintiff incorporates by reference each and every material fact of this Complaint as if set forth fully herein.

140.    Defendants showed utter indifference, gross negligence, and conscious disregard for Plaintiff and the public's safety because they knew Gynemesh PS was unreasonably dangerous in light of the severe and permanent complications associated with the product yet withheld and misrepresented the dangers and distributed the product onto the market.

141.    Despite their knowledge of the danger, Defendants continued to sell the products to maximize profits and the expense of patients', like Plaintiff's, health.

142.    Defendants' tortious actions and omissions, willful misconduct, intentional conduct, reckless conduct, fraudulent conduct, malice, wantonness, oppression, and the entire want of care that would raise the presumption of a conscious disregard to the consequences of their actions.

143.    Defendants' conduct injured Plaintiff.

144.    An award of punitive and exemplary damages against Defendants to punish, penalize, and deter these Defendants and others similarly situated from repeating such egregious conduct in the future is justified.

## COUNT VIII
## Loss of Consortium

145.    Plaintiff Daniel Barrett incorporates by reference each and every material fact of the Complaint as if set forth fully herein.

146.    At all relevant times, Plaintiff Daniel Barrett was and is the lawful husband of Plaintiff Elizabeth Barrett.

147.    As a direct and proximate result of the injuries sustained by Plaintiff Elizabeth Barrett due to Defendants' defective mesh, Plaintiff Daniel Barrett has suffered the loss of his wife's consortium, companionship, services, and support.

148.    Plaintiff Daniel Barrett is entitled to recover damages from Defendants due to this loss of consortium, companionship, services, and support.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants and request:

A.    Compensatory damages in excess of the minimum jurisdictional amount, including, but not limited to, compensation for injury, pain, suffering, mental anguish, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined by the triers of fact in this action;

B.    Economic damages in the form of medical expenses, out-of-pocket expenses, life care expenses, and other economic damages in an amount to be determined by the triers of fact in this action;

C.      Punitive damages;

D.      Attorneys' fees, expenses, and other costs of this action; and,

E.      Such relief as this Honorable Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all issues.

This 14th day of November, 2022.

Respectfully submitted,

**VALIENTE MOTT**

*/s/ Nathan D. Quist*
Nathan D. Quist
Utah Bar No. 16143
2975 W. Executive Parkway
Lehi, Utah 84043
Telephone: 385-999-2999
Email: nate@valientemott.com

**TURNBULL, HOLCOMB & LEMOINE, P.C.**

M. Alan Holcomb*
Georgia Bar No. 879771
Janeen E. Smith*
Georgia Bar No. 377429
945 East Paces Ferry Road, NE, Suite 2275
Atlanta, Georgia 30326
Telephone: (404) 793-2566
Facsimile: (404) 348-4260
Email: aholcomb@turnbullfirm.com
            jsmith@turnbullfirm.com

* *Pro Hac Vice* Application to be filed

*Attorneys for Plaintiffs*

- 24 -